# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

GLENDA AVERY,          )
                               )
      Plaintiff,         )
                               )
v.                           )    Case No.: 2:17-cv-01927-SGC
                               )
KOCH FOODS OF GADSDEN, LLC,[1]  )
                               )
      Defendant.     )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Glenda Avery initiated this matter, alleging employment discrimination on the basis of her race, gender, and age. (Doc. 1). The complaint asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), 42 U.S.C. §§ 1981 and 1981(a) ("§ 1981"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (the "ADEA"). (Doc. 1). Presently pending is the motion for summary judgment as to all claims filed by Defendant Koch Foods of Gadsden, LLC. (Doc. 23). The motion is fully

---

[1] The complaint names two defendants: Koch Foods and Koch Foods of Gadsden, LLC. (Doc. 1). In its answer, Koch notes: (1) there is no legal entity named Koch Foods; and (2) Koch Foods of Gadsden, LLC, is the proper defendant because it was the plaintiff's employer. (Doc. 6 at 1; *see* Doc. 7 at 1). The plaintiff has not disputed these contentions. Accordingly, the Clerk of Court is **DIRECTED** to **TERM** "Koch Foods" as a party to this matter.

[2] The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 12).

briefed and ripe for adjudication. (Docs. 24-25, 27-28, 30). As explained below, the motion for summary judgment is due to be granted in its entirety.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## II. SUMMARY JUDGMENT FACTS

Plaintiff, an African American woman born in 1956, began working in a Gadsden, Alabama poultry processing plant (the "Plant") in 1974. (Doc. 27 at 4-5; Doc. 1 at 1). The Plant changed ownership over the years until Koch bought it in 2007. (Doc. 24 at 4). Plaintiff worked at the Plant in various positions for forty-two years until Koch terminated her in 2017. (Doc. 27 at 5). At all relevant times, Koch had in place anti-discrimination policies and Rules of Conduct. (Doc. 24 at 3). Among the Rules of Conduct were: (1) Rule No. 5, prohibiting theft of property, including Koch's property; and (2) Rule No. 14, prohibiting job abandonment—the unauthorized departure from a work shift. (*Id.* at 3-4). Breaking either of these rules, even on a first offense, could result in immediate termination. (*Id.*).

At the time of her termination, Plaintiff was working as a lead ("Lead") employee in the chiller rehang department ("Chiller Rehang"). (Doc. 27 at 5). Plaintiff began working in that role in September 2016, when the department in which she had been working as Lead was eliminated. (Doc. 24 at 4-5). In Chiller Rehang, workers remove chicken from the chiller and hang it from shackles

moving overhead.  (*Id.* at 5).  As Lead, Plaintiff was an hourly employee, but she was responsible for monitoring the work of other hourly employees and keeping the line moving.  (*Id.* at 4; Doc. 27 at 5).  Plaintiff did not work on the line unless another employee needed her to step in.  (Doc. 27 at 5).  During Plaintiff's time as Chiller Rehang Lead, she had a succession of three supervisors: Johnny Williamson, Noel Balcazar, and Johnny Chacon.  (*Id.*).  Chacon became the supervisor in January 2017, and occupied the position when Plaintiff was terminated two weeks later.  (*Id.*).  Chacon, who is twenty-six, was hired directly out of college as a supervisor.  (*Id.*).  Plaintiff testified Chacon: (1) asked her how old she was; (2) told her "you've been here long enough, before I was born"; (3) called her "old-fashioned" and "old-school"; and (4) asked her when she was going to retire.  (*Id.* at 5-6).

Workers in Chiller Rehang, including Leads, are required to take two unpaid, thirty-minute breaks per shift.  (Doc. 24 at 5).  Plaintiff understood she and other Koch employees were required to clock-out before unpaid breaks and to clock-in before returning to work.  (Doc. 25-1 at 15).  When the majority of workers took their scheduled unpaid breaks, a "Floor Person" would stay on the clock and wash down and sanitize equipment.  (Doc. 24 at 5).  These tasks took approximately 30 minutes, and the Floor Person would take an unpaid break after the other workers returned to the line.  (Doc. 27 at 6).  The Lead was responsible

for making sure the other workers returned and the line was running smoothly after a scheduled break, so each of Plaintiff's unpaid breaks were scheduled after the other workers returned to the line. (*See id*.; Doc. 24 at 6).

When the majority of workers went on break, Plaintiff would retrieve any birds from the floor, clean and cover the wash station, put lids on products, and make sure everything was covered up. (Doc. 27 at 6). These tasks took approximately five to ten minutes; after finishing them, Plaintiff didn't have anything to do until the line workers' break ended. (*Id.* at 7). Accordingly, Plaintiff would often go to the parking lot, retrieve a cigarette from her car, and sit in the smoking area with other employees. (*Id.*). Plaintiff would then return to the Plant in preparation for the other workers' return to the line. (*Id.*). Johnny Williamson—Plaintiff's first supervisor in Chiller Rehang—knew Plaintiff was taking breaks without clocking out. (Doc. 27 at 7). When the line was up and running after a scheduled break, Williamson would tell her to take her unpaid break. (Doc. 27 at 7). During the time Plaintiff was supervised by Noel Balcazar, he told her to continue doing her job as she had. (*Id.*). Chacon's supervisor, Brian Graves, repeatedly told Plaintiff she was doing a good job prior to her termination. (*Id.* at 5).

In September 2016, Koch installed turnstiles outside the Plant. (Doc. 24 at 6). To enter the Plant from the parking lot, Koch employees had to swipe an

access card through a digital card reader.  (*Id.*).  This data gave Koch the ability to run a "Swipe Report" identifying each time an employee entered the plant through the turnstiles.  (*Id.*).  Exits from the Plant area are not recorded, so a Swipe Report would not capture the times at which an employee left.  (Doc. 27 at 8).

On January 30, 2017, Plaintiff learned her son's wife was in labor; Chacon gave her permission to leave work and go to the hospital.  (Doc. 24 at 7).  Plaintiff forgot to clock-out when she left the Plant and did not clock-in when she returned later that day.  (*Id.*; Doc. 27 at 8).  Among Chacon's daily duties is completing payroll, which includes ensuring employees' timecards have the correct number of punches.  (Doc. 24 at 7).  While completing payroll on January 30, 2017, Chacon realized Plaintiff had forgotten to clock-out when she went to the hospital.  (*Id.*).  In order to accurately determine the times at which Plaintiff left and returned to work, Chacon spoke with a Plant safety manager about reviewing security camera footage.  (*Id.* at 8).  The Plant safety manager suggested it would be more efficient to review a Swipe Report.  (*Id.*).  Managers at the Plant did not routinely review Swipe Reports, and Chacon had not done so previously.  (*Id.*).  Chacon agreed to the suggestion and reviewed Plaintiff's weekly Swipe Report.  (*Id.*).

Upon reviewing the Swipe Report, Chacon noticed Plaintiff entered the Plant more often than he anticipated on a daily basis. (Doc. 24 at 8-9).[3] Chacon completed payroll and returned to the production floor during one of the line workers' unpaid breaks; on his way back to Chiller Rehang, he encountered Plaintiff reentering the plant. (*Id.* at 9). Chacon asked the Floor Person if Plaintiff stayed in Chiller Rehang during the line workers' unpaid breaks. (*Id.*). The Floor Person responded negatively, stating "she's never been out here. She usually goes on break." (*Id.*). Chacon was concerned by this state of affairs because he knew Plaintiff took an unpaid break after the line workers returned from each of their breaks. (*Id.*). Chacon relayed this information to his supervisor, Brian Graves. (*Id.*). In response, Graves modified the schedule so that Plaintiff's unpaid breaks overlapped with that of the line workers. (*Id.*; Doc. 27 at 8). Chacon informed Plaintiff of the schedule change on February 1, 2017, and Plaintiff complied with the new break times. (Doc. 27 at 8).

Chacon also met with Cindy DeBerry, a Koch human resources manager, and informed her that Plaintiff had been: (1) taking breaks with the line workers without clocking out; and (2) taking her unpaid breaks after the line workers returned to Chiller Rehang. (Doc. 24 at 9-10). Chacon and DeBerry reviewed two

---

[3] Plaintiff notes she typically arrived at the Plant early and entered through the turnstiles to eat breakfast. (Doc. 27 at 6). After eating, Plaintiff would typically exit the Plant to retrieve items from her car before re-entering to begin her shift. (*Id.*). This explanation accounts for one additional turnstile swipe per workday.

to three months of Swipe Reports showing the times when Plaintiff entered the Plant area. (Doc. 27 at 8). Chacon and DeBerry met with Plaintiff on February 3, 2017, to discuss the situation; during the meeting, Plaintiff admitted she would leave the Plant area without clocking out. (Doc. 24 at 10). Plaintiff stated she would go to the parking lot and either sit in her car or retrieve cigarettes and go to the smoking area. (*Id.*). Review of the Swipe Reports revealed Plaintiff had been leaving and reentering the Plant without clocking out on a nearly twice-daily basis for approximately two months. (*Id.* at 11). Plaintiff notes: (1) during the times when she took breaks without clocking out, she had already completed her assigned tasks and did not have any work to do; (2) Chacon never complained that Plaintiff failed to complete tasks during the production workers' unpaid breaks; (3) her previous supervisors knew she was taking paid breaks and did not object; and (4) Chacon never told Plaintiff she should stay in Chiller Rehang to assist the Floor Person. (Doc. 27 at 4, 6-7). Nevertheless, Plaintiff was suspended for three days at the conclusion of the February 3, 2017 meeting. (*Id.* at 8-9).

Koch's investigation of the matter continued during Plaintiff's suspension. (Doc. 24 at 11). DeBerry consulted Bobby Elrod, a Koch human resources director, in making the decision to terminate Plaintiff for stealing time and abandoning her work station. (*See* Doc. 27 at 9). DeBerry informed Elrod of Plaintiff's age, gender, and race. (*Id.*). Koch informed Plaintiff of her termination

via a February 8, 2017 telephone call. (*Id.*). Koch's Disciplinary Action Notification form states Plaintiff "has been leaving her work area for an hour each day while on the clock. – Stealing time." (Doc. 25-6 at 77). During her deposition, DeBerry testified Plaintiff was spending approximately fifty minutes per day outside the Plant area without clocking out (Doc. 25-3 at 19). Notes from the investigation suggest Koch thought Plaintiff was taking two paid breaks a day, each lasting 20 to 25 minutes. (Doc. 25-6 at 78-79). Plaintiff testified she spent only ten to fifteen minutes on each paid break, for a total of 25 to 30 minutes each day. (*See* Doc. 25-1 at 43). Shon Estel replaced Plaintiff after her termination; Estel is a white male and was twenty-six when he was hired as Chiller Rehang Lead. (Doc. 27 at 9).

DeBerry testified that, prior to the situation with Plaintiff, she was not aware of the capability to run Swipe Reports. (Doc. 25-3 at 9). DeBerry also testified she had not reviewed the Swipe Reports for all Leads or other Plant employees to compare their conduct to Plaintiff's but had at times reviewed Swipe Reports for individual employees at the request of supervisors. (*Id.* at 10). During these *ad hoc* reviews, DeBerry testified she had not encountered another employee who exited and entered the Plant as often as Plaintiff did. (*Id.*).

From December 2016 through January 2017, Plaintiff averaged 5.2 swipes per shift. (Doc. 28-1 at 3). Plaintiff points to other Leads who had similar

numbers of swipes per shift during the same two-month period of time: (1) Jamar Clay, an African-American male born in 1987, averaged 5.2 swipes per shift, including multiple shifts with six to nine swipes; (2) Michael Mayhall, a White male born in 1978, averaged 5.5 swipes per shift, including four days with ten swipes; (3) Kenneth Moore, an African-American male born in 1968, averaged 5.3 swipes per shift, including multiple shifts with six to nine swipes; and (4) Luis Sebastian, a Hispanic male born in 1975, averaged 4.4 swipes per shift, including multiple shifts with six to nine swipes. (Doc. 27 at 11). Additionally, Plaintiff testified Chacon allowed Estel—her replacement as Chiller Rehang Lead—to take smoke breaks for thirty to forty minutes. (*Id.* at 12). Plaintiff also notes three maintenance employees did not clock out before leaving for lunch but were not terminated. (*Id.*; Doc. 25-3 at 13-15).

Plaintiff subsequently applied for Social Security Disability Insurance ("SSDI") primarily due to chronic back pain, listing her disability onset date as February 3, 2017—the same day Koch suspended her. (Doc. 25-1 at 7; Doc. 25-8 at 5). Plaintiff testified she had worked at the Plant for years with this pain and could still perform her job there because it did not require much lifting. (Doc. 25-1 at 8, 57). The Social Security Administration ultimately granted Plaintiff benefits and determined her disability onset date was October 4, 2017. (Doc. 28-3 at 2).

## III. DISCUSSION

Plaintiff asserts claims on the basis of her race, gender, and age. While these claims arise under various statutes, all of her claims—which are based on circumstantial evidence—are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *E.g. Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *Porter v. Am. Cast Iron Pipe Co.*, No. 09-0845-AKK, 2010 WL 11507904, at *15 (N.D. Ala. May 28, 2010); *Smith v. Vestavia Hills Bd. of Educ.*, No. 16-0842-VEH, 2018 WL 1408537, at *1 (N.D. Ala. Mar. 21, 2018), *aff'd,* No. 18-11626, 2019 WL 5700747 (11th Cir. Nov. 5, 2019). After a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *E.g. Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993). This burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly light," *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). As long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

After an employer articulates one or more legitimate, nondiscriminatory reasons for the employment action, the plaintiff must show the proffered reason

was a pretext for illegal discrimination. *Chapman v. AI Transp.*, 229 F.3d 1012, 1025 (11th Cir. 2000). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must "meet that reason head on and rebut it." *Id.* at 1030. To demonstrate pretext, the plaintiff must show the proffered reason was false and that discrimination was the real reason for the employer's action. *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

### A. Plaintiff's Claims Are Not Barred By Her Disability Application

Koch contends Plaintiff cannot satisfy her *prima facie* case as to any of her claims because she cannot prove an element common to each claim: her qualification to perform her job. (Doc. 24). Koch's arguments in this regard rely on Plaintiff's application for SSDI, which listed her disability onset date as February 3, 2017, the same day Koch suspended her. Koch cites *Cleveland v. Policy Mgmt. Sys. Corp.*, in which the Supreme Court held a plaintiff asserting claims under the Americans with Disabilities Act ("ADA") must show her inability to work—alleged in an SSDI application—was consistent with her ability to perform the essential functions of her job, as required under the ADA. 526 U.S. 795, 805 (1999). A plaintiff with the burden of showing she was qualified to perform a job cannot "simply ignore the apparent contradiction" and must provide a "sufficient explanation." *Id.* at 806.

A sufficient explanation is one:

> sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Id.* at 807. The Court also noted:

> if an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system. Our ordinary Rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to "set forth two or more statements of a claim or defense alternately or hypothetically," and to "state as many separate claims or defenses as the party has regardless of consistency."

*Id.* at 805.

Here, Plaintiff's claims are not barred under the rationale of *Cleveland*. First, Plaintiff has sufficiently explained why her alleged disability onset date does not contradict her contention that she was qualified to do her job. Specifically, Plaintiff notes she had been suffering from back pain for years while working at the Plant, but she could perform her job because it did not require heavy lifting. (Doc. 25-1 at 8, 57). Next, while SSA ultimately granted Plaintiff's SSDI application, it determined her disability onset date was October 4, 2017, eight months after her alleged onset date and the date of her termination. (Doc. 28-3 at 2). Accordingly, regarding Plaintiff's ability to perform her job at the time of her termination, "any inconsistency in the theory of the claims is of the sort normally

tolerated by our legal system." *Cleveland*, 526 U.S. at 805. However, because Plaintiff's claims fail under the *McDonnell Douglas* burden-shifting analysis, the court need not consider any impact of her disability onset to her damages.

### B.    Plaintiff Cannot Establish Pretext as to Any of Her Claims

Koch asserts it had a legitimate reason for terminating Plaintiff: her admitted, months-long practice of taking two breaks per shift without clocking out. (Doc. 24 at 15). This satisfies Koch's "exceedingly light" burden. *Perryman*, 698 F.2d at 1142. In response, Plaintiff contends comparator evidence shows Koch's rationale for terminating her is merely pretext for discrimination on the basis of gender, race, and/or age. (Doc. 27 at 17). Additionally, Plaintiff relies on Chacon's "ageist" remarks to carry her burden as to the ADEA claim. (*Id.* at 24). As explained below: (1) Plaintiff's proposed comparators are not similarly situated; and (2) Chacon's remarks are insufficient to establish pretext for age discrimination.

### 1.    Plaintiff Has Not Identified a Suitable Comparator

Plaintiff points to four younger, male Koch employees working as Leads in different departments with an average number of daily swipes similar to Plaintiff's: (1) Jamar Clay; (2) Michael Mayhall; (3) Kenneth Moore; and (4) Luis Sebastian. (Doc. 27 at 17). Additionally, Plaintiff notes Mayhall and Sebastian were a different race than Plaintiff; they are White and Hispanic, respectively. (*Id.*).

Plaintiff notes these proposed comparators were not terminated as a result of their excessive daily swipes.

In order to show pretext through comparator evidence, a plaintiff must present comparators who are "similarly situated in all material respects." *Lewis v. City of Union, Ga.,* 918 F.3d 1213, 1224 (11th Cir. 2019). The unrebutted evidence shows Sebastian and Clay are not suitable comparators because they were Leads in the Maintenance and Shipping Departments, respectively. As a Maintenance Lead, Sebastian entered and left the plant through the turnstiles as part of his job duties. (*See* Doc. 25-7 at 5). Accordingly, Sebastian's average 4.4 swipes per shift does not suggest he was taking unauthorized breaks without clocking out. Similarly, as a part of his regular work duties as a Shipping Lead, Clay would often leave the Plant through the Shipping dock and re-enter the Plant through the turnstiles to avoid walking through the entire Plant. (*See id.*). Accordingly, Clay's average 5.2 swipes per shift does not indicate he was taking unauthorized breaks without clocking out. Because Clay's and Sebastian's job duties differed from Plaintiff's—often requiring them to pass through the turnstiles while working—they are not similarly situated to Plaintiff with regard to the number of swipes per shift. Accordingly, Neither Clay nor Sebastian is an appropriate comparator for Plaintiff.

Plaintiff's attempt to use Mayhall and Moore as comparators also fails, albeit on different rationale. Plaintiff attempts to establish pretext by noting that Swipe Reports for Mayhall and Moore showed them entering the Plant: (1) more frequently per shift than would be expected; (2) at a similar average daily rate to Plaintiff; (3) on some days, up to nine or ten times—a greater frequency than DeBerry testified would be excessive. (Doc. 27 at 17). In the context of *prima facie* claims for disparate treatment, the Eleventh Circuit has held that less severe discipline for the conduct of a proposed comparator is only relevant if the employer knows about the comparator's misconduct. *Jones v. Gerwens*, 874 F.2d 1534, 1542 (11th Cir. 1989). In *Jones*, the plaintiff was an African American police officer disciplined for unauthorized personal use of a departmental truck. On appeal, the plaintiff relied on evidence that white officers had also misused the truck. In affirming the trial court's grant of summary judgment on the plaintiff's claim for racially disparate treatment, the Eleventh Circuit held the plaintiff's *prima facie* case required him to show his supervisors were "aware of prior uses of the Unit truck by white officers for personal business or prior instances in which unauthorized persons had been permitted to ride in the truck, and that the known violations were consciously overlooked." *Id.* The court further noted "previous tolerance of Unit truck use for personal business would be relevant only if it could be shown that either [decision maker] knew of such practices and did not act to

discipline rule violators." *Id.* Because the plaintiff failed to produce evidence of this knowledge, the Eleventh Circuit affirmed the grant of summary judgment. *Id.*

Courts in this circuit, including courts sitting in this district, have interpreted *Jones* as requiring plaintiffs alleging disparate treatment to produce evidence showing decision makers imposed lighter discipline for the same conduct of proposed comparators. *Summers v. City of Dothan, Ala.*, 444 F. App'x 346, 348 (11th Cir. 2011) ("proffered comparators' actions are only relevant if it is shown that the decision maker knew of the prior similar acts and did not discipline the rule violators. . . . Knowledge of a prior act cannot be imputed on a decision maker, because 'discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.'") (citing *Jones,* 874 F.2d at 1542, and quoting *Silvera v. Orange Cnty. Sch. Bd.,* 244 F.3d 1253, 1262 (11th Cir.2001) (alteration incorporated)); *Amos v. Tyson Foods, Inc.*, 153 F. App'x. 637, 647 (11th Cir. 2005) ("Employees are not 'similarly situated' if management is aware of one's improper conduct, but not aware of the others' conduct."); *Moore v. Jimmy Dean/Sara Lee Foods, Inc.*, 520 F. Supp. 2d 1359, 1368 n.28 (N.D. Ala. 2007) (granting summary judgment to employer where decision maker offered unrebutted testimony that she was unaware of proposed comparator's misconduct); *see also, e.g., Moreland v. Miami-Dade Cty.*, 255 F. Supp. 2d 1304, 1313 (S.D. Fla. 2002);

*Wyant v. Burlington N. Santa Fe R.R.*, 210 F. Supp. 2d 1263, 1283 (N.D. Ala. 2002).

Here, the unrebutted evidence shows DeBerry, the Koch decision maker who terminated the plaintiff, was unaware Mayhall and/or Moore exited and entered the Plant at a greater-than-expected frequency per shift. DeBerry testified that, prior to the situation with Plaintiff, she was unaware of the capability to run Swipe Reports. (Doc. 25-3 at 9). While DeBerry has subsequently reviewed Swipe Reports for individual employees at the request of their supervisors, she testified she has not undertaken a comprehensive review of Swipe Reports for all Plant employees or Leads. (*Id.* at 10). DeBerry further testified that, of the Swipe Reports she has reviewed on this *ad hoc* basis, she has not encountered another employee who exited and entered the Plant as often as Plaintiff did. (*Id.*). Similarly, while Chacon—Plaintiff's direct supervisor who discovered the issue and brought it to DeBerry's attention—was not a decision maker regarding Plaintiff's termination, his unrebutted testimony shows he was unaware of Koch's ability to run Swipe Reports until he did so to accurately record Plaintiff's time for the day she forgot to clock out to attend the birth of her grandchild. Because the unrebutted evidence shows Koch decision makers did not know about Mayhall's and/or Moore's excessive entries into the Plant, they are not suitable comparators for Plaintiff: (1) about whom the Koch decision makers did know; and (2) who

admitted she had been taking multiple breaks per shift without clocking out for months.

Finally, even if Koch knew of Mayhall and Moore's conduct, the plaintiff has still not proffered enough evidence to show they are similarly situated. The plaintiff relies exclusively on the average number of swipes per shift. However, the unrebutted evidence shows the plaintiff admitted to taking two paid breaks a day for months. The plaintiff has not pointed to evidence of the circumstances surrounding Mayhall's and Moore's Swipe Reports, much less that they made similar admissions to taking paid breaks for months.[4] For the foregoing reasons, Plaintiff has failed to identify a suitable comparator and thus cannot show pretext via comparator evidence.

Plaintiff attempts to show pretext by arguing DeBerry's testimony regarding her review of Swipe Reports was evasive. (Doc. 27 at 21). Plaintiff also contends the fact DeBerry was aware of her age, race, and gender creates a genuine issue of material fact regarding her motivations for terminating Plaintiff. (*Id.* at 21-22). Each argument is addressed in turn.

---

[4] Although unclear, Plaintiff may also rely on three other male maintenance employees who left the Plant to get lunch without clocking out in September 2016. (Doc. 27 at 12). However, as Koch notes, these employees were not similarly situated to Plaintiff because their unauthorized absence was a one-time occurrence, not an ongoing practice. (Doc. 24 at 17). Similarly, it is unclear whether Plaintiff relies on Estel as a comparator; her statement of facts states Chacon did not discipline him for taking smoke breaks, but her brief's discussion does not return to this fact. (Doc. 27 at 12). To the extent Plaintiff relies on Estel as a comparator, he is not similarly situated; at the time of the events giving rise to Plaintiff's claims, Estel was a line worker—not a Lead.

Plaintiff points to the following portions of DeBerry's deposition, when Plaintiff's counsel asked if she had reviewed Swipe Reports for other Leads at the Plant:

Q.    . . . I'm talking about the period before Ms. Avery got fired. Have you ever looked at anybody's records before Ms. Avery got fired. Have you ever looked at anybody's records before Ms. Avery got fired to determine whether they were also leaving the plant during times that were not their break times?

A.    No.  I can't recall before Ms. Avery's situation that this even was a situation that we were aware of.  As we said, that turnstile record was not available until . . . maybe the last week of September. So we were not that familiar with even the capability of looking at such records and did not realize that this was something that we needed to follow up with until this became evident that it was an issue.

Q.    And that became evident in February of 2017 with Ms. Avery?

A.    Yes, sir.

Q.    Did you go back and look at anybody else's records at that point?

A.    That particular day, I did not.

Q.    Well, around the time period that Ms. Avery was fired or after that time period, did you go back and check the period from September until February to see who else was doing the same thing, if anybody?

    MS. AHNERT: Object to the form.

A.    I don't know that that was a purposeful project that I did at that time.  I have checked on several occasions when supervisors would come to me and ask can we get a report and it would be for any particular employee.  I don't necessarily know that their job title

would be lead, so that again, is another thing that I have pause with, trying to determine if I can remember the job title of the people that we've checked. There have been some that we have checked, but I'm not certain if their job title is lead.

Q.    Well, I mean, the only thing you would have to look at would be the swipe report and to see if they got more than, you know, three punches during a day. You could just run your finger down it like you did with Ms. Avery and see who's got that.

A.    But to answer the question, has that happened.

Q.    Right.

A.    Then, that would be the answer. I'm not certain the job title of the people that they've had us run a report on and that we've checked. The job title of lead is not necessarily the only place that you might have a problem that you sometimes need to check.

(Doc. 25-3 at 9-10; *see id.* at 8). Plaintiff's counsel then broadened his question, asking whether DeBerry had reviewed Swipe Reports for any employees at the Plant, regardless of their position. (*Id.* at 10). DeBerry responded affirmatively, that she had checked reports of "some" employees. (*Id.*).

Q.    Have you found some where they have gone -- been leaving the plant more than they should?

A.    I can tell you that we have not found anybody that was -- had the excessive amounts of turnstile swipes that we had to deal with in February of 2017 with Ms. Avery.

***

Q.    Okay. Have you searched the records to see if anybody else has done that, is all I'm asking. Done an across-the-board search?

A.    No, sir. I have not done an across the board search.

21

(Doc. 25-3 at 10). Later, Plaintiff's counsel returned to the same line of questioning, asking whether DeBerry had reviewed Swipe Reports for other Leads:

A.     As I said before, I'm not certain of the job titles.

Q.     It's just when somebody brings it up?

A.     Yes. If somebody asks me to look at something, I do.

Q.     Looking at it, you have decided that there were some anomalies, but none was as excessive as Ms. Avery's?

A.     None were excessive as Ms. Avery's.

(Doc. 25-3 at 19-20).

The foregoing passages from DeBerry's deposition testimony do not reveal evasive answers. DeBerry unequivocally testified she had not reviewed any Swipe Reports prior to February 2017, when she reviewed Plaintiff's. DeBerry also testified she had never performed a Plant-wide review of employees' Swipe Reports. Rather, DeBerry only reviewed Swipe Reports at the request of supervisors regarding individual employees. Finally, DeBerry testified that none of the Swipe Reports she reviewed on this *ad hoc* basis demonstrated the excessive number of trips through the turnstiles revealed by the Plaintiff's Swipe Report. The court finds DeBerry's testimony in this regard was straightforward. Moreover, Plaintiff's counsel never inquired whether DeBerry had reviewed Swipe Reports

for Mayhall or Moore, Plaintiff's proposed comparators. Accordingly, no inference of pretext or discriminatory animus arises.

As to DeBerry's knowledge and discussion of Plaintiff's protected characteristics, she testified that she informed Bobby Elrod of Plaintiff's race, gender, and date of birth. (Doc. 25-3 at 7). Plaintiff contends this creates an inference of pretext and discrimination. (Doc. 27 at 21-22) (citing *Carter v. Decisionone Corp.*, 122 F.3d 997 (11th Cir. 1997)). In *Carter*, the Eleventh Circuit affirmed summary judgment for the defendant where the decision maker was unaware of the plaintiff's protected characteristics when the decision was made to terminate the plaintiff. 122 F.3d at 1002-03. Here, Koch has not argued it was unaware of Plaintiff's protected characteristics when it terminated her. Accordingly, *Carter* is irrelevant. Even under the summary judgment standard, simply knowing a plaintiff belongs to a protected group or noting her protected characteristics does not constitute evidence of pretext or discrimination.

### 2. Chacon's Statements Do Not Show Pretext

Finally, Plaintiff relies on several statements made by Chacon to support her age discrimination claim under the ADEA. Specifically, Plaintiff relies on her deposition testimony that Chacon: (1) asked how old she was; (2) stated she had been working at the plant "long enough, before [he] was born"; (3) called the Plaintiff "old-fashioned" and "old-school"; and (4) asked her when she was going

to retire. (Doc. 27 at 5, 24-25). As an initial matter, Plaintiff testified she interpreted Chacon calling her old-fashioned and old-school to refer to her performance of her duties as Lead, including ensuring the line workers were back from breaks on time and that she "was just very good at [her] job." (Doc. 25-1 at 16). Accordingly, even under the summary judgment standard, it would be a stretch to consider these statements to be evidence of age-based discrimination.

Next, and more importantly, all of Chacon's statements described by Plaintiff constitute isolated remarks by a non-decision maker. *Porter*, 2010 WL 11507904, at *15 (finding comments or jokes regarding plaintiff's retirement plans did not demonstrate age discrimination and listing examples of remarks that do not give rise to an inference of age discrimination: (1) "brief, stray remarks unrelated to the termination decisional process"; and (2) "inquiries into an employee's retirement plans") (citations omitted)); *see Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1329 (11th Cir. 1998) (without context, manager's statement that "older people have more go wrong" was not probative of discriminatory animus); *see also Minton v. Am. Bankers Ins. Group, Inc.*, No. 02-12942, 2003 WL 21303330, at *1 (11th Cir. Feb. 6, 2003) (per curiam) (employer's statements the company needed "fresh new blood" and "it was about time the older employees stepped aside" in favor of younger employees, coupled with questions about plaintiff's retirement plans, did not constitute direct evidence of age discrimination). Accordingly,

Chacon's age-related statements are insufficient to show pretext regarding the plaintiff's ADEA claim.

Finally, considering all of the Plaintiff's evidence, she has not presented "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent" because, even viewed in the light most favorable to Plaintiff, she has not demonstrated "a 'convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (footnote and quotation marks omitted); *see Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).

## IV. CONCLUSION

For all of the foregoing reasons, there are no genuine issues of material fact, and Koch is entitled to judgment as a matter of law. Accordingly, Koch's motion for summary judgment is **GRANTED** in its entirety, and Plaintiff's claims are due to be dismissed with prejudice. (Doc. 23). A separate order will be entered.

**DONE** this 3rd day of March, 2020.

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE